IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2018

## STATE OF TENNESSEE v. AARON CHARLES GARLAND

**Appeal from the Criminal Court for Washington County**
No. 40924(A)     Stacy L. Street, Judge

_____

### No. E2017-02438-CCA-R3-CD
_____

A Washington County jury convicted the Defendant, Aaron Charles Garland, of first degree felony murder and robbery. The trial court sentenced the Defendant to life imprisonment. On appeal, the Defendant asserts that the trial court improperly denied his motion to suppress his statements to police and that the evidence was insufficient to support his conviction for first degree felony murder. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Jeffrey C. Kelly, District Public Defender; Steven McEwen, Assistant Public Defender, Elizabethton, Tennessee; and William L. Francisco, Assistant Public Defender, Johnson City, Tennessee, for the appellant, Aaron Charles Garland.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Kenneth C. Baldwin, District Attorney General; and Frederick M. Lance, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the murder of the victim, Karen Parker, inside her home in Johnson City, Washington County, Tennessee on August 18, 2015. The victim's credit card was used soon after by the Defendant and his co-defendant, Dallas Sarden. The Defendant and Sarden were detained by police on unrelated robbery charges in Sullivan County. While in police custody, the Defendant made several statements that he later

sought to suppress. For the Defendant's role in the victim's death, a Washington County grand jury indicted him for first degree felony murder and robbery.

## A. Motion to Suppress

The Defendant filed a motion to suppress three statements: one made to Investigator Martin Taylor and two made to Investigator Justin Adams. He asserted that his Fifth and Sixth Amendment rights had been violated. At the suppression hearing, the parties presented the following evidence: Martin Taylor, a Kingsport City Police Department officer, testified that he investigated an aggravated robbery, which although unrelated, had occurred close in time to the victim's murder. In connection with the unrelated aggravated robbery, Investigator Taylor located the Defendant and Sarden walking in Kingsport City, Tennessee, on August 20, 2015. Investigator Taylor performed a pat-down on both men and Sarden admitted to being in possession of cocaine. The Defendant told Investigator Taylor that he needed to speak to him privately. Investigator Taylor asked the Defendant what he wanted to speak about, and the Defendant replied, "The credit card. Karen is not his mother." Investigator Taylor knew of the death of the victim, Karen Parker, in Johnson City, which had occurred the previous day, following which the victim's credit card had been used at a Shoney's restaurant.

Investigator Taylor transported the Defendant and Sarden to the jail. The Defendant was taken to a private room so Investigator Taylor could speak with him privately; Investigator Taylor denied that the Defendant was in custody at this point. Investigator Taylor asked the Defendant what he wanted to talk about, and the Defendant began talking about "the credit card." The Defendant said that Sarden told the Defendant that he had the credit card with the name "Karen" on it from robbing a girl. The Defendant said that Sarden's mother's name was not "Karen." The Defendant said that "Karen" was "the white girl [Sarden] got the card from." The Defendant stated that Sarden had used the credit card at a Shoney's restaurant. Investigator Taylor testified that he did not recite the *Miranda* warnings at any point and reiterated that he had not charged the Defendant at that time.

On cross-examination, Investigator Taylor testified that he detained both men "to follow-up with the credit card issue" and due to the "fact that we had had the aggravated robbery that occurred in Kingsport matching the description of those suspects as well." Investigator Taylor had been contacted by Johnson City police with a description of the two men before detaining them. After being detained, the Defendant was later arrested and gave a statement to police. Investigator Taylor agreed that, when he stopped the Defendant on the street, the Defendant was not free to leave. When asked if the Defendant was free to leave once taken to the police department, Investigator Taylor said

that the Defendant had approached him about speaking to him and had not asked to leave thereafter.

Investigator Justin Adams, a Johnson City police officer, testified that he interviewed the Defendant on August 20, 2015, after Investigator Taylor. Investigator Adams identified the *Miranda* waiver form that the Defendant signed during their interview. Investigator Adams knew that the victim, Karen Parker, had died under suspicious circumstances. Investigator Adams questioned the Defendant about his relationship with Sarden as well as the stolen credit card. Investigator Adams explained that someone was using the victim's credit card after she had died. The Defendant "blamed" the credit card incidents on Sarden and did not mention how Sarden obtained the stolen credit card.

On cross-examination, Investigator Adams agreed that he recorded his interview with the Defendant; the interview recording was played in court. Investigator Adams told the Defendant that he was not "in trouble" but was connected to their investigation of the victim's death. The Defendant did not leave custody that day.

Daniel Price, an officer with the Sullivan County Sheriff's Office, testified that he worked in the detention facility where the Defendant was incarcerated in 2015 and that the Defendant flagged him down one day to speak with him. The Defendant told Officer Price that he wanted to speak to Detective Gerald Ray to confess to first degree murder.

Investigator Martin Taylor was recalled as a witness and he testified that, on September 27, 2015, someone from the Sullivan County jail contacted him and said that the Defendant wanted to talk about a homicide. Investigator Taylor went to the jail and spoke with the Defendant. Throughout their conversation, the Defendant insisted on being transferred to another facility, causing Investigator Taylor to discontinue the interview. Investigator Taylor later informed the Johnson City Police Department about his contact with the Defendant.

Investigator Justin Adams was recalled as a witness and testified that he was told about Investigator Taylor's interaction with the Defendant and the Defendant's desire to discuss a homicide. Investigator Adams confirmed arrangements for the Defendant to be transferred to a different facility in Washington County, following which he met with the Defendant on September 29, 2015. The Defendant gave a full written statement detailing the circumstances of the victim's credit card being stolen and the Defendant's role in the victim's death. Investigator Adams issued the required *Miranda* warnings before the Defendant provided his statement. A *Miranda* waiver form, signed by the Defendant, was entered into the record as an exhibit. Investigator Adams stated that the Defendant did not request an attorney at the time he gave his statement.

- 3 -

On cross-examination, Investigator Adams said that he did not know if the Defendant had an attorney when he took the Defendant's statement during their second interview. Investigator Adams stated that he was aware at the time that criminal proceedings related to the robbery case had commenced in Sullivan County but stated that he did not assume that the Defendant had already retained counsel.

At the conclusion of the hearing, the trial court made the following findings:

[W]ith regard to the first statement [made to Investigator Taylor]. This court is of the opinion that there is no question that [the Defendant] was in custody. You can call it whatever you want to, officers can call it whatever you want to. If you're not able to stand up and say, I'm out [of] here, and walk out the door you are in custody. So, [the Defendant] was in custody at that time. And I think the [S]tate concedes as much. But, I'm going to agree with the [S]tate that there was not an interrogation. There was asking questions. There was statements being made, but I don't think there was the interrogation that is contemplated by the Miranda decision at that point in time. So, any statements made prior to the . . . Miranda signing the court finds that there is not an interrogation. [The Defendant] was in custody but not interrogation and those statements [to Officer Taylor] are admissible at trial. After that statement it is clear that there was . . . a Miranda warning and waiver that was executed by [the Defendant] on August 20th, 2015, at 13:30 p.m. And for the record it's clear he signed both the acknowledgement and the waiver on that Miranda warning. So, at that point in time he had been advised. He gave the statement. And I understand that Investigator Adams said you're not in trouble. You're not in trouble. The only way you're going to get into more trouble is -- is to not tell the truth. We all know that techniques like that are learned techniques. Defense lawyers call it tricky and unconstitutional. Prosecutors call it good police work and it's up to the courts to decide what crosses the line. I will note that I don't believe for one minute that you did not think you were going over there, Investigator Adams, investigating a homicide. That's exactly what you were doing and [the Defendant] was on your radar. You were fishing to see if [the Defendant] would give you something. But, at this point in time after the Miranda warnings I do not think that you crossed the line with -- with promises that you could not -- about him not being in trouble. So, I'm going to find that, although, I -- I question some of the testimony today about what your purposes were for interviewing him, that you did not cross the line in your questions and that any statements made after the . . . Miranda waiver signing will also be

admissible. Now, recorded interview [the Defendant] clearly asked for counsel, and he continued to persist in asking for counsel, and that's important for this court. The interview ends and Investigator Adams, Investigator Taylor certainly continue working on the case. Now, this is what's troublesome to this court now, though. I remember the day that [the Defendant] was brought in, and the reason why I remember is because he was brought in on a motion to revoke his bond. This court had sent him to the Day Reporting Center, and because he had new charges I was eager to revoke his bond, and eager to address the fact that he violated, but he asked for counsel that day. After he asked for counsel the court appointed the public defender's office. He was then taken from the courtroom. I don't want to say transported. After he left the courtroom then I was asked by the DA's office to set that for September 30th, so he could be arraigned for First Degree Murder with the co-defendant Mr. Sarden. So, the court was taken aback at that time. So, that leads to the second statement that was given, and the issue here is a Sixth Amendment violation. The Sixth Amendment differs from the Fifth in that one is remain silent, the other is the right to counsel and after that counsel has been invoked. The court had appointed counsel, not on the murder case yet, but on a violation of probation. As I'm certain that they are apt to do, and would expect nothing less from the investigators, they're working this case. They know as much about it as they possibly can. They know about the violations. They know about the court appearances. They know he has counsel. And it may happen occasionally, but I dare say if one of these officers right now called over at CID in Washington County, Johnson City, Kingsport, Sullivan County and said, hey, will you do me a favor, run over there and transport a passenger over -- a prisoner for me they would tell you to drop dead. You wouldn't do it unless you had an interest in doing it. And [the Defendant] wasn't transported back to the detention center. He was transported back to the Johnson City Police Department to do the interview. Now, if that's all that I had right here then this court would suppress the second statement [to Investigator Adams]. I would do that because it may -- it may be legal when you look at all of them, but when you look at the big picture it stinks! It stinks to do that. It should be wrong. But, I go back to something I said previously. [The State] is correct. If the conversation is initiated by the defendant this court has to apply a different standard. . . . . And we go by a different standard if he initiates the conversation, and in this case the court finds that [the Defendant] initiated the conversation. And the issues about quid pro quo and promises back and forth they both were jockeying for position, both the [D]efendant and the investigators. But, the court finds that [the Defendant] knew how to ask for an attorney because you

remember the end of the interview, I want a lawyer.  I need a lawyer.  He knew how to do that.  So, the court has evidence that he knew how to invoke his right to counsel.  And, even though, he had an attorney; even though, this court appointed him an attorney, the law says that he can initiate the conversation, and once he does we apply a different standard than if the . . . police initiated the conversation.  So, for that reason I'm going to find that the second statement will be admissible.  And your motion to suppress, although, it's a close case in -- in many circumstances, the court finds that the motion to suppress should be denied respectfully at this time.

### B. Motion to Reconsider

The Defendant filed a motion to reconsider the trial court's denial of his motion to suppress.  In his motion, the Defendant alleged that he was subject to intentional or coincidental improper coercion by police when he was placed in a cell with an inmate who was violent and over-bearing, such behavior amounted to manipulation of the Defendant resulting in his request to speak with Investigator Adams.  The following evidence was presented at the hearing on the motion to reconsider:  Paul Trivette testified that he was employed by the Bristol Police Department in September 2015 and that he arrested Issac Ketron for aggravated assault and other crimes.  Mr. Ketron threatened police and resisted arrest.  He was transported to the Sullivan County jail.  Officer Trivette characterized Mr. Ketron as "very violent."

The Defendant testified that he knew Mr. Ketron from the Sullivan County jail where the two men shared a cell.

Investigator Adams testified that he was approached by another officer on September 27, 2015 about the Defendant wanting to speak with him.  The Defendant was in Sullivan County jail and Investigator Adams arranged for the Defendant to be transferred to the Johnson City detention center.  Investigator Adams himself transported the Defendant.  Once there, the Defendant was presented with a *Miranda* waiver form, which he signed, and Investigator Adams proceeded to interview the Defendant and record a formal statement.  Investigator Adams drafted the statement, read it to the Defendant, and allowed him to sign it.

On cross-examination, Investigator Adams agreed that he was told the Defendant did not like the conditions at the Sullivan County jail and wanted to be moved.

The trial court made the following statement at the conclusion of the hearing:

- 6 -

The court is still looking to see whether or not [the Defendant] voluntarily initiated contact to talk about murder. The defense wants the court to find that because [the Defendant] was placed with a crazed maniac in that cell that that somehow prompted him to be forced to give the statement, or that he was coerced into giving the statement. What this court cannot do is require that it be given proof as to why a defendant gives a statement each time. I don't know what mot -- motivates defendants to talk to law enforcement. I don't know if it's a religious conviction, their conscience getting the better of him, or they're just tired of where they're at. But, this court finds that Number (1) there was no state action on the part of the state to intentionally create a situation where [the Defendant] would give a statement. First of all, they had no idea that [the Defendant] was going to give a statement. Second of all, they did not purposely place Isaac Ketron in a cell to attempt to get a statement from [the Defendant]. Cases require this court to look for those situations where there's state actions where they create a situation knowing, or in the hopes that it would create a situation -- a situation by which [the Defendant] would give a statement. Sure, the state's the one that runs the jail. Sure, the state's the one that put Ketron in there, but, he wasn't put in there for the purposes of . . . agency I should say, but they're not the ones that put Mr. Ketron in there for the purposes of making [the Defendant] not want to be there. And most telling the court has read the inmate grievance request from [the Defendant] and it looks like he was trying to do then exactly what he was trying to do when he wanted to speak to the Johnson City Police Department. He was trying to cut a deal. Quid pro quo, whatever we called it before, he was trying to cut a deal because he didn't like the conditions of the Sullivan County Detention Center. He didn't like the cell he was in, so, they moved him. He thought he was going to get over in the dayroom, which if my mind serves me correctly is a little less nasty than the rest of the jail there, not much, but a little less nasty. But, he didn't get moved there. He got moved into -- into a tank and he didn't like that and he wanted out of there, so, he was trying to negotiate something else. That's on him. But, this court finds that it does not affect this court's previous ruling that he initiated the contact with the officer even after a previous invocation of counsel. He knew how to ask for counsel. He knew how to ask to be moved. He knew how to ask to complain when he was being threatened. And none of that was stated after he got his end of the bargain of being out of the Sullivan County Detention Center. So, after hearing the proof today your motion to reconsider the order denying suppression of the [D]efendant's statement is respectfully denied.

- 7 -

## C. Trial

At the Defendant's trial, the parties presented the following evidence: Randy Miller testified that he worked as an exterminator and was exterminating the victim's apartment building on August 18, 2015. He knew the victim from previous interactions with her. He entered her apartment, with the building's maintenance man, on the morning of August 18 and found the victim on the floor with a couch leg resting atop her leg and her head covered with a blanket. Mr. Miller described the victim's apartment as being in disarray. The victim was cold, so Mr. Miller called 911.

Michael Hollifield testified that he worked as a maintenance man at the victim's apartment building and had accompanied Mr. Miller into the victim's apartment on August 18. Mr. Hollifield was friendly with the victim, whom he described as "harmless," and he recalled that she kept a clean apartment. When Mr. Hollifield entered the victim's apartment on August 18 with Mr. Miller, he found the victim lying on the floor. Mr. Hollifield checked her pulse and, finding none, asked Mr. Miller to call 911. Mr. Hollifield described the victim's body as underneath her sofa, her head partially covered with a blanket, and her shirt pulled up and pants pulled down. The victim had bruises on her arms and torso. The victim's apartment was in disarray in a manner inconsistent with the way Mr. Hollifield had seen it many times before.

Stephen Diehl testified that he worked as a firefighter for the Johnson City Fire Department and that he responded to the victim's apartment where he found her body on the floor. He testified that he found her body in a condition consistent with Mr. Miller's and Mr. Hollifield's descriptions.

Kristen Osgood testified that she was the medical legal death investigator for Washington County and that she responded to the scene of the victim's death. Ms. Osgood identified photographs taken of the apartment and its contents, including a photograph of the victim's wallet, showing that it was empty, and a photograph of the victim's purse and its contents emptied onto the bed.

Dr. Eugene Scheuerman was qualified as an expert in the field of forensic pathology and testified that he performed the autopsy on the victim's body. Dr. Scheuerman testified that he determined the victim's cause of death was suffocation, blunt force injuries, and possible manual strangulation. He also testified to several contributory factors leading to the victim's death, including heart disease and pulmonary disease. Dr. Scheuerman noted injuries on the victim's body including bruises on her arms and hands, consistent with a blunt force injury, and abrasions on the victim's face and neck. Dr. Scheuerman identified other marks or bruises on the victim that he stated were consistent with her being held down.

On cross-examination, Dr. Scheuerman agreed that factors usually present in death by suffocation were not present in the victim's corpse. He testified that any one of the victim's injuries would not have caused her death but that the blunt force trauma injuries, taken together with the victim's heart disease and pulmonary disease, caused her death. On redirect-examination, Dr. Scheuerman testified that marks on the victim's neck indicated that she had been manually strangled.

Vanessa Gause, the victim's neighbor testified that she visited with the victim the night before her body was found and that the victim had no marks or bruises on her body.

Laura Chandley testified that she was the victim's sister and that she went to the victim's apartment when the victim's body was found. She testified that, prior to the victim's murder, her family had some "concerns" about the victim's credit card, so one of the victim's family members was placed on the victim's bank account as an authorized user. The day after the victim's body was found, the victim's family went to the bank to close the victim's account. A bank employee accessed the victim's account and determined that the victim's credit card was still being used after the time of the victim's death.

Investigator Martin Taylor testified that he received information about a credit card taken from the scene of a homicide that was later used at a Shoney's restaurant in Kingsport, Tennessee. Investigator Taylor received a description of two men who had attempted to use the credit card and, using the information, he identified the Defendant and Sarden, seen walking together. Investigator Taylor detained both men and took Sarden into custody on unrelated charges. Sarden told Investigator Taylor that he had used the credit card the night before in Johnson City and that it belonged to his mother. The Defendant later asked to speak with Investigator Taylor on the subject of the credit card, which he told the investigator did not belong to Sarden's mother but to a woman Sarden had robbed.

Reona Garland testified that she had been the victim's neighbor prior to the victim's death and had known the victim since Ms. Garland was a child. She stated that the Defendant was her cousin. The Defendant came to Ms. Garland's house the day before the victim's death, at approximately nine o'clock at night. Ms. Garland allowed the Defendant to stay in her apartment that night. When she awoke at 5 a.m. the next day, the Defendant was already gone.

Ashley Hickman testified that she knew the Defendant from high school but did not remain friends with him. On August 18, 2015, the day of the victim's death, the

Defendant and Sarden called Ms. Hickman to ask her for a ride. She picked up the two men and gave them a ride to Kingsport.

Glenda Ann Nester testified that she was working at the Shoney's Restaurant in Kingsport, Tennessee when the Defendant and Sarden came in for a meal. Their payment was declined, so restaurant management called the police because the men could not pay. Other customers paid the men's bill. Ms. Nester recalled that the victim's name was on the credit card that was declined.

John Patterson, a Regions Bank employee, testified that the victim's credit card was used four times before it was closed by the victim's relatives. The credit card was used seven more times, albeit unsuccessfully, including one transaction at a Shoney's restaurant in Kingsport. The card was used several times in Johnson City.

Investigator Justin Adams testified that he worked as a criminal investigator for the Johnson City Police Department and was in charge of the investigation of this case. He interviewed the Defendant, after issuing *Miranda* warnings, and obtained a signed, written statement in which the Defendant stated that he and Sarden had entered the victim's apartment on the night of her death. The Defendant stated that Sarden hit the victim and held her down while the Defendant searched her apartment for money and car keys. The Defendant eventually noticed that the victim was not moving. The men rifled through the victim's purse and wallet and took her credit card. The men left the victim's apartment and eventually got a ride from Ms. Hickman to Kingsport.

Lieutenant Kevin Peters was called as a witness by the Defendant. He testified that he worked for the Johnson City Police Department and that he held a press conference addressing the victim's death, during which he stated that the victim's body showed no signs of trauma. On cross-examination, he testified that, at the time of the press conference, he had not seen the autopsy photos, which he agreed showed signs of trauma.

Dr. John Claiborne Hunsaker, III testified that he was retired from the field of forensic pathology and had performed approximately ten thousand autopsies during his career. Dr. Hunsaker was admitted as an expert in the field of forensic pathology. Dr. Hunsaker testified that he had reviewed the autopsy report created in this case and, after analyzing the report, he was unable to conclude the cause of the victim's death. Dr. Hunsaker, in essence, disagreed with some of the findings in the autopsy report, specifically related to the toxicologist's findings that drugs were irrelevant to her death.

On cross-examination, Dr. Hunsaker agreed that strangulation and blunt force trauma could not be ruled out as the cause of the victim's death.

After hearing this evidence, the jury convicted the Defendant of first degree felony murder and robbery. The trial court imposed a life sentence for the murder conviction with a concurrent five-year sentence for the robbery charge for an effective sentence of life imprisonment. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court improperly denied his motion to suppress and that his conviction for first degree felony murder is unsupported by the evidence.

### A. Motion to Suppress

The Defendant contends that the trial court should have suppressed his statements to Investigator Taylor about the stolen credit card, made after he was detained in Kingsport with Sarden, and to Investigator Adams, made during this detention and later while he was incarcerated. The Defendant argues that Investigator Taylor should have provided *Miranda* warnings to the Defendant before he questioned him in the interview about the victim's credit card. As to his statements to Investigator Adams, made on two separate occasions, the Defendant contends that, on the first occasion, his statement was involuntary, and that on the second, his Sixth Amendment right to counsel was violated. The State responds that the trial court properly determined that the Defendant's statement to Investigator Taylor was not elicited by means of interrogation because the Defendant requested to speak with Investigator Taylor, thus initiating the contact between them. Additionally, the State argues that his statement was not a product of coercive custodial interrogation. The State further responds that the Defendant's statements made to Investigator Adams were initiated by the Defendant, were made after he had been advised of his rights, and were made voluntarily. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact,

is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### 1. Investigator Taylor

The Defendant argues that his statement made to Investigator Taylor, made on August 20, 2015 after being taken into custody, was the product of a custodial interrogation made without prior *Miranda* warnings. The State responds that the trial court correctly determined that the Defendant initiated the contact with Investigator Taylor, alleviating the *Miranda* warning requirement, and made the statement of his own free will. In the order denying the motion to suppress, the trial court made the following findings:

> I'm going to agree with the [S]tate that there was not an interrogation. There was asking questions. There was statements being made, but I don't think there was the interrogation that is contemplated by the Miranda decision at that point in time. So, any statements made prior to the . . . Miranda signing the court finds that there is not an interrogation. [The Defendant] was in custody but not interrogation and those statements [to Officer Taylor] are admissible at trial.

Custodial interrogation is limited to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

> [T]he term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). There is a difference between police initiated custodial interrogation and communications, exchanges, or conversations initiated by the accused himself. *See Edwards v. Arizona*, 451 U.S. 477 (1981). It is well established that questioning initiated by the accused is not interrogation in the *Innis* sense. *Edwards*, 451 U.S. at 484. At the very least, the police must have asked a question that was "probing, accusatory, or likely to elicit an incriminating response" before a court may conclude that there was interrogation.

In the present case, the Defendant asked to speak to the investigator to tell him about the Defendant's knowledge of the stolen credit card. Again, there is no constitutional protection from statements volunteered by the accused. *Id.* The definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301-301. Additionally, where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *Michigan v. Tucker*, 417 U.S. 433, 441 (1974). Given the trial court's findings that the Defendant initiated the discussion with Investigator Taylor and was not subject to coercion, we hold that the trial court did not err in concluding that the Defendant's statement was not the product of unconstitutional custodial interrogation. Accordingly, the motion to suppress the statement was properly denied. This issue is without merit.

### 2. Investigator Adams

The Defendant argues that his statements made to Investigator Adams, made on August 20 during the time he was in custody and later on September 29 while he was incarcerated, were involuntary and the product of coercion, based on deceptive interview tactics utilized by Investigator Adams. He argues that these custodial interrogations were in violation of his Fifth and Sixth Amendment rights. The State responds that the Defendant rights were not violated because he received *Miranda* warnings and because he initiated contact with investigators expressing a desire to make a statement. In its order denying the Defendant's motion to suppress, the trial court made the following findings as to this issue:

> After that statement [to Investigator Taylor] it is clear that there was . . . a Miranda warning and waiver that was executed by [the Defendant] on August 20th, 2015, at 13:30 p.m. And for the record it's clear he signed both the acknowledgement and the waiver on that Miranda warning. So, at that point in time he had been advised. He gave the statement. And I understand that Investigator Adams said you're not in trouble. . . . . But, at this point in time after the Miranda warnings I do not think that [the investigator] crossed the line . . . . So, I'm going to find that, although, I -- I question some of the testimony today about what your purposes were for interviewing him, that you did not cross the line in your questions and that any statements made after the . . . Miranda waiver signing will also be admissible. Now, in the recorded interview [the Defendant] clearly asked for counsel, and he continued to persist in asking for counsel, and that's important for this court. The interview ends and Investigator Adams,

Investigator Taylor certainly continue working on the case. . . . So, that leads to the second statement that was given [on September 29], and the issue here is a Sixth Amendment violation. . . . . The court had appointed counsel, not on the murder case yet, but on a violation of probation. . . . . And we go by a different standard if he initiates the conversation, and in this case the court finds that [the Defendant] initiated the conversation. And the issues about quid pro quo and promises back and forth they both were jockeying for position, both the [D]efendant and the investigators. But, the court finds that [the Defendant] knew how to ask for an attorney because you remember the end of the interview, I want a lawyer. I need a lawyer. He knew how to do that. So, the court has evidence that he knew how to invoke his right to counsel. And, even though, he had an attorney; even though, this court appointed him an attorney, the law says that he can initiate the conversation, and once he does we apply a different standard than if the . . . police initiated the conversation. So, for that reason I'm going to find that the second statement will be admissible.

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an accused's privilege against self-incrimination. Moreover, the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating custodial interrogation, to advise the accused of his right to remain silent and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-479 (1966). Assuming the use of these procedural safeguards by police interrogators and provided that the accused is acting voluntarily, knowingly, and intelligently, an accused may waive his *Miranda* rights. *State v. Mann*, 959 S.W.2d 503, 529 (Tenn. 1997).

The right to counsel guaranteed by the Sixth Amendment and by Article I, section 9 attaches at the time the State initiates adversarial judicial proceedings against the defendant. *Michigan v. Jackson*, 475 U.S. 625, 629 (1986); *Huddleston*, 924 S.W.2d at 669 (Tenn. 1996). A defendant's Sixth Amendment right to counsel may have attached at the time of his statement but that does not necessarily mean that the police questioning violated his Sixth Amendment right to counsel. *See Patterson v. Illinois*, 487 U.S. 285, 293 (1988) (explaining that *Miranda* warnings effectively convey to a defendant his right to have counsel present during questioning and also adequately inform a defendant of "the ultimate adverse consequence" of making uncounseled admissions). Further, *Miranda* warnings "suffice[ ] . . . to let [the defendant] know what a lawyer could 'do for him' during the post indictment questioning" namely, advise him to refrain from making statements that could prove damaging to his defense. *Patterson* at 294. Accordingly, "[s]o long as the accused is made aware of the 'dangers and disadvantages of self-representation' during post-indictment questioning, by use of the *Miranda* warnings, his

waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" *Id*. at 300.

The Defendant signed a *Miranda* waiver form on August 20, 2015, after he had spoken with Investigator Taylor, at his own request, but prior to his recorded interview with Investigator Adams. Investigator Adams interviewed the Defendant and throughout, he referred to the Defendant not being in trouble and stated that the outcome of the interview depended on the Defendant's cooperation. The trial court concluded that while this was a police tactic often credited with tricking suspects into cooperating, Investigator Adams's tactic did not cross the line into the realm of deceit sufficient to warrant the conclusion that the Defendant's statement was involuntarily made. Based on our review, we conclude that the Defendant's statement was knowing and voluntary, as he had read and signed a *Miranda* waiver form. Furthermore, the questions and tactics used by the investigator did not rise to level of deception or coercion necessary to require the suppression of the statements.

As to the Defendant's second statement, made in September 2015 after he had been incarcerated for over a month, the Defendant requested the interview with the detectives. We conclude therefore, that the Defendant waived his Sixth Amendment right to counsel and that the trial court did not err by refusing to suppress the statements that resulted from the interview. The Defendant is not entitled to relief as to this issue.

**B. Sufficiency of the Evidence**

The Defendant contends that the evidence is insufficient to support his conviction for first degree felony murder because, he contends, there was no evidence presented placing him at the victim's apartment, and because the victim's death could have occurred naturally, as testified to by Dr. Hunsaker. The State responds that the evidence is sufficient form which the jury could conclude that the Defendant intended to rob the victim and while doing so, killed her. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established

- 15 -

exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of felony murder, which, as relevant to this case, is the killing of another during the perpetration of or attempt to perpetrate any robbery. T.C.A. § 39-13-202(a)(2). The only mental state required for felony murder is the intent to commit the underlying felony. T.C.A. § 39-13-202(b). When one defendant enters into a scheme with another to commit one of the enumerated felonies and a death ensues, all defendants are responsible for the death and may be convicted of felony murder regardless of who actually killed the victim or whether the killing was specifically contemplated by the other. *State v. Utley*, 928 S.W.2d 448, 451 (Tenn. Crim. App. 1995). The Defendant was also convicted of robbery, which is defined as the intentional or knowing theft of property from the person of another by violence or putting the other person in fear. T.C.A. § 39-13-401.

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to find the Defendant's conduct constituted the killing of the victim during the perpetration of a robbery. The evidence was that the Defendant and Sarden were staying near the victim's home in the Defendant's cousin's apartment on the night of August 17, 2015. They entered the victim's apartment after seeing her in the hallway and stole money from her wallet and purse. Sarden hit the victim after which the Defendant noticed that she was no longer moving while on the floor. The Defendant and Sarden left the victim's apartment, and she was found dead a number of hours later. By its verdict, the jury chose to accredit the State's witness who testified that the cause of her death was homicide, as is within its province. This is sufficient evidence from which a jury could find beyond a reasonable doubt that the Defendant was guilty of first degree felony murder. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

 

 

 

_____
ROBERT W. WEDEMEYER, JUDGE